897 A.2d 821

**Wesley Allen ROLLINS**

v.

**STATE of Maryland.**

**No. 19 Sept. Term, 2005.**

Court of Appeals of Maryland.

May 5, 2006.

458

Stacy W. McCormack, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), Baltimore, for Petitioner/Cross-Respondent.

Edward J. Kelley, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD. on brief), Baltimore, for Respondent/Cross-Petitioner.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, Judge.

After a jury trial in the Circuit Court for Baltimore County, petitioner, Wesley Allen Rollins, was convicted of the crimes of first-degree felony murder, second-degree murder, robbery, and burglary relating to the death of Irene Ebberts. Petitioner seeks review of the judgment of the Court of Special Appeals affirming his convictions. We granted *certiorari*, *Rollins v. State*, 387 Md. 462, 875 A.2d 767 (2005), to review the denial of petitioner's pretrial motion to exclude the testimony of deputy medical examiner, Dr. Mary G. Ripple, allegedly derived from "hearsay information unrelated to medical findings" in the autopsy report for Ms. Ebberts that was prepared by former Assistant Medical Examiner, Dr. Joseph Pestaner. Petitioner alleges that because Dr. Ripple's opinion was based on hearsay statements contained in the autopsy report from witnesses who may or may not testify at trial, Rollins's right to confrontation under the Sixth and Fourteenth Amendments of the United States Constitution and

under Article 21 of the Maryland Declaration of Rights [1] would be violated by the admission of such testimony. In addition, we shall review the trial court's alleged error in the admission of Dr. Ripple's expert testimony relating to the time and manner of Ms. Ebberts's death.

Petitioner presents two questions for our review, which we have rephrased: [2]

1. Did the admission of the autopsy report in the instant case violate the petitioner's Sixth Amendment right to confrontation?

2. If preserved, did the trial court err in allowing the medical examiner to render an expert opinion regarding the cause and time of death of Ms. Ebberts?

For the reasons stated below, we answer both questions in the negative and affirm the judgment of the intermediate appellate court. We hold that the autopsy report, as redacted, contained non-testimonial hearsay statements in nature that were admissible under either the business or public records exceptions to the hearsay rule. We further hold that, under the facts of the instant case, the availability of a witness is

---

1. The Confrontation Clause of the Sixth Amendment of the United States Constitution, and Article 21 of the Maryland Declaration of Rights, provide that the accused in all criminal prosecutions shall enjoy the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI.; Md. Const., Art. 21.

2. Petitioner's original questions presented were:
 1. Is an autopsy report testimonial in nature as that term has been defined in both *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and this Court's opinion in *State v. Snowden*, 385 Md. 64, 867 A.2d 314 (2005), such that its admission at trial without the testimony of the medical examiner who prepared the report is a violation of a defendant's Sixth Amendment right to confrontation?
 2. Whether the trial court erred in allowing a medical examiner (1) to rely on "findings" contained in an autopsy report prepared by a medical examiner who was not called to testify at trial, and (2) to render an expert opinion that the victim "died of asphyxia during the robbery" where such an opinion lacked an adequate factual basis and was derived from information unrelated to medical findings?

immaterial to the question of admissibility of hearsay evidence under either the business or public records exception. Opinions, speculation, and other conclusions drawn from the objective findings in autopsy reports are testimonial and should be redacted before the report is admitted into evidence. Because all testimonial statements in nature were redacted from the autopsy report prepared by Dr. Pestaner prior to its admission into evidence, and because the autopsy report fit within the business and public records hearsay exceptions, petitioner's rights under the Confrontation Clause were not violated.

## Facts

The facts surrounding the death of Ms. Ebberts were detailed by the intermediate appellate court:

On October 19, 2001, John Ebberts called his Uncle, William Garland, and asked him to determine whether his mother, the victim, seventy-one year old Irene Ebberts, was all right. Upon arriving at the victim's house, Garland, his brother, and his brother's wife, noticed the screen door and front door were open. They entered the home and found the victim lying in her bed. Although her oxygen machine was still operating, she was unresponsive to Garland.

The paramedics subsequently arrived, responding to a "cardiac arrest" call from Garland, and pronounced the victim deceased upon arrival. After recounting the victim's poor health and recognizing "no signs of trauma," the paramedics turned off the victim's oxygen machine and the police arrived shortly thereafter. Baltimore County Police Officer Richard McCampbell was the first to arrive at the scene and the victim's relatives explained that the victim was in poor physical health. Officer McCampbell observed an open window near the victim, which had "dirt and debris" on the window sill, and noticed there was a garbage can adjacent to the open window outside the home. He subsequently contacted the Baltimore County Homicide Unit with what he deemed a "suspicious death." Homicide Detective Childs arrived and, after noting the same observations Officer McCampbell had made, discovered that the pillows

were in the middle of the bed without covers, as well as "some evidence of ransacking or searching the bedroom." During the investigation, officers discovered that cash and jewelry boxes belonging to the victim were missing. The victim's neighbor, the appellant, became a suspect after his girlfriend provided the officers with information, including the fact that [Rollins] told her he could kill the victim by "putting a pillow over her head."

*Rollins v. State,* 161 Md.App. 34, 42–43, 866 A.2d 926, 930–31 (2005) (footnote omitted).

Petitioner was arrested on October 24, 2001, and during questioning admitted to breaking into Ms. Ebberts's house to "borrow" money, but denied harming her. He was consequently charged with burglary on that same day. On October 20, 2001, Dr. Pestaner noted on the victim's death certificate that the cause of death was "pending," and on October 29, 2001, Dr. Pestaner concluded, as stated in the autopsy report, that the cause of death was "smothering" and the manner of death was "homicide." Dr. Pestaner's autopsy report included the following pathologic diagnoses determining the cause of Ms. Ebberts's death: (I) "[s]mothering;" (II) "[h]ypetensive cardiovascular disease;" (III) "[l]ung, bronchopneumonia;" (IV) "[c]hronic bronchitis and pulmonary emphysema;" and (V) "[p]leural adhesions." In the "Opinion" portion of the autopsy report, Dr. Pestaner noted that Ms. Ebberts had died of "smothering, a lack of oxygen from covering the nose and mouth." Evidence of smothering included "hemorrhage in the mucosa on one side of the mouth." The manner of death noted by Dr. Pestaner was "homicide."

The autopsy report, as redacted, was summarized by the Court of Special Appeals:

The contents of the autopsy report may be summarized as follows: Pages two and three of Dr. Pestaner's report, captioned "INTERNAL EXAMINATION", detail the condition of the victim's body cavities, head, neck, cardiovascular system, respiratory system, liver and biliary system, elementary tract, genitourinary system, recticuloendothelial

system, endocrine system and musculoskeletal system. Aside from the pathologies associated with the victim's bronchopneumonia exacerbated by severe emphysema and heart disease, the results of the internal examination were unremarkable. On page one of Dr. Pestaner's report, the external examination revealed a 1 inch contusion on the left elbow and the right arm had a 2? × 1? contusion. Under the caption, "EVIDENCE OF INJURY," Dr. Pestaner indicated: the right buccal mucosa adjacent to the upper denture, in an area adjacent to the root of tooth # 3, had a 1/4? area of superficial hemorrhage. No petechiae were noted of the eyes, mouth, face or airway. The form of the neck was atraumatic. Under "MICROSCOPIC EXAMI-NATION," the following was noted: "Gum: Acute hemorrhage into underlying non-keratinizing squamous epithelium and into underlying connective tissue Right Forearm: Acute hemorrhage. Scattered iron positivity. Right Arm: acute hemorrhage. Iron stain negative." Dr. Pestaner's conclusions are summed up on the final page of the autopsy report:

> This 71 year old white female, Irene Ebberts, *died of smothering, a lack of oxygen from covering the nose and mouth.* Ms. Ebberts was found dead in bed at her house. *Investigation revealed personal property missing and previous threats of harm had been made to smother Ms. Ebberts.* Autopsy revealed a sick woman who had significant heart and lung disease and an acute pneumonia was present in the lung. Evidence of smothering[3] included

---

**3.** As the intermediate appellate court surmised, the redacted autopsy report is absent from the record. It would appear that the portions of the autopsy report that were italicized in the intermediate appellate court's opinion in the instant case indicate the areas that were redacted prior to the report's admission into evidence. Apparently, in the process of publishing its opinion and identifying the redacted portions, by italicizing them, the intermediate appellate court neglected to italicize one reference to "smothering." *See id.* at 43 n. 1, 866 A.2d at 931 n. 1. The court's omission is not significant because, based upon our review of the record, it is clear that the Circuit Court specified the removal of *all* references to "smothering" in the autopsy report. We are unable to find any reference in the record that limits the redaction

hemorrhage in the mucosa on one side of the mouth. *The manner of death is homicide.* The decedent was not consuming alcoholic beverages prior to death and a comprehensive drug test was negative. There was no evidence of sexual activity.

*Id.* at 43 n. 1, 866 A.2d at 931 n. 1. The following describes the information surrounding the admission of the autopsy report, the trial judge's redactions, and the intermediate appellate court's conclusions:

As to the contents of the autopsy report to which appellant specifically interposed an objection, the record unequivocally discloses that appellant objected to admission of the report

---

of the term, "smothering" to only certain parts of the autopsy report. Moreover, petitioner did not contend in the trial court, nor does he contend before us, that the court erred in failing to redact all references of smothering from the report before it was given to the jury. Petitioner's argument was and is that the report was not admissible into evidence without the presence of Dr. Pestaner.

At the motions hearing held on March 27, 2003, the Circuit Court gave a copy of the autopsy report to defense counsel and instructed counsel to circle the parts of the report that constituted an opinion, and to which the defense objected. The State reviewed the items that the defense had circled, and the court then addressed each item determining whether the item should be redacted. The trial court noted the following:

[THE COURT]: All right. Pathological diagnosis. Smothering. Out. *Hypertensive and [atherosclerotic cardiovascular] disease.* Out. That is an opinion.

\* \* \* \*

[THE COURT]: [Speaking about the look of the autopsy report post-redaction] I rather suspect that you are going to be left with something that is redacted that just says that smothering, hypertensive and [atherosclerotic cardiovascular] disease and homicide.

[THE STATE]: **That those would be removed?**

[THE COURT]: **In my opinion those would be the only thing[s] removed unless she says something else that surprises me that some of these other things are matters of opinion, which I don't think that they are.**

[THE STATE]: **Very well.**

(Emphasis added.) A search of all of the transcripts in the instant case provided evidence, through the statements of the trial court, and through multiple references to redactions during testimony, that all opinions as to the cause and manner of death were redacted from the autopsy report. *See Rollins, supra,* 161 Md.App. at 76–77 n. 11, 866 A.2d at 951–52 n. 11.

without the testimony of Dr. Pestaner; then he specifically objected to any opinion contained in the report; he also objected to Dr. Ripple's use of the report in formulating her own opinion. Turning to the question of whether all or part of the report was admitted into evidence, we cannot discern from our inspection of the autopsy report contained in the record on appeal that any portion of the report was redacted. The court's statements, however, regarding opinions in the report during the hearing on the Motion to Exclude Testimony of the Medical Examiner, and various references to deletions from the report during examinations of witnesses, indicate that the court did, in fact, redact the cause and manner of death.

\* \* \* \*

During the course of the hearing on the Motion to Exclude the Testimony of the Medical Examiner, the court had decided that "the only thing I can see here that is an opinion is disease ... smothering ... [and] homicide" and disease; the court indicated that it would "make sure that the doctor will say that the rest of these are factual observations." Accordingly, the trial judge redacted what he determined constituted opinion, i.e., the section captioned "manner of death" and the references to smothering, homicide and disease. Consequently, the trial judge removed from the jury's consideration the ultimate conclusion contained in Dr. Pestaner's report that the manner of death was homicide by asphyxiation. There is no issue presented regarding the denial of the right to confrontation, therefore, as to Dr. Pestaner's opinion regarding the cause of death.

*Rollins,* 161 Md.App. at 76–79, 866 A.2d at 951–52 (footnote omitted).

Rollins was charged with murder on October 31, 2001. Dr. Pestaner did not testify at trial.[4] Rollins filed a pretrial

---

4. With regard to the appearance of Dr. Pestaner at trial, there was some confusion: Defense counsel noted that he was informed that Dr. Pestaner no longer worked at the Medical Examiner's Office and that he had been told that it was the policy of the Medical Examiner's Office

motion to prevent the deputy medical examiner, Dr. Ripple, from offering testimony and opinions that were "based on hearsay information that is unrelated to the medical findings of the examination of the alleged victim." Rollins argued that Dr. Ripple's conclusions and opinions were largely unsupported by the contents of the autopsy report and that her opinions were based upon "hearsay statements that were provided by the investigating detectives in this case, rather than medical findings." *Id.* at 43–44, 866 A.2d at 931. Pursuant to Maryland Rule 5–702, Rollins also contended that Dr. Ripple's opinion was "based on testimony from potential witnesses whom the State would otherwise be required to call in its case in chief rather than medical findings," and, thus, the testimony would not be helpful to the jury. Petitioner's assignment of error in the intermediate appellate court was based on his contention that Dr. Ripple's testimony would constitute a violation of the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights.[5] The defense motion to prevent the testimony of Dr. Ripple was noted, but denied.

At trial, the State presented Dr. Ripple as an expert witness and the defense countered with three expert witnesses who

to "try and replace somebody else to do the medical testimony in this case." The trial judge urged defense counsel to subpoena Dr. Pestaner, at which time the State indicated that, although they were not certain if they would do so, they might submit the autopsy report itself without Dr. Pestaner. It was eventually concluded that Dr. Pestaner had left the State of Maryland and was a practicing coroner in the State of California at the time of trial.

5. Rollins's constitutional argument was posed as follows:
Because the medical examiner's opinion is based upon hearsay statements from witnesses who may or may not testify, the admission of such testimony would violate the defendant's rights under the Sixth and Fourteenth Amendments to the Constitution of the United States to confront and cross-examine witnesses, his right to trial by jury to determine the witness credibility issues under the Sixth and Fourteenth Amendments to the Constitution of the United States, and his right to Due Process of law under the Fifth and Fourteenth Amendments to the Constitution of the United States.
*Rollins,* 161 Md.App. at 44, 866 A.2d at 932.

disputed Dr. Ripple's testimony on various grounds, each essentially contending that Ms. Ebberts died of natural causes. Rollins was found guilty by the jury of first-degree felony murder, second-degree murder, robbery, and burglary. As a result of the first-degree murder conviction, the State sought the death penalty. Ultimately, the trial judge sentenced Rollins to life without the possibility of parole.

## Discussion

I. Did the admission of the autopsy report in the instant case violate the petitioner's Sixth Amendment right to confrontation?

Rollins primarily contends that the admission of Ms. Ebberts's autopsy report, without the testimony of the doctor who prepared the report, violated his constitutional right to "be confronted with witnesses against him" under the Confrontation Clause, Amendment VI of the Constitution of the United States and Article 21 of the Maryland Declaration of Rights. The seminal case on this issue is *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Petitioner contends that the *Crawford* decision changed the law regarding the Confrontation Clause, and thus argues that the distinction between fact and opinion in an autopsy report is no longer a factor in determining whether the admission of an autopsy report—absent the testimony of the person who prepared the report—violates an accused's right to confrontation.[6]

---

6. The intermediate appellate court's interpretation of *Crawford* in the instant case led it to conclude that "the opinions/conclusions in the autopsy report in the instant case fall squarely within the 'business records' exception of the hearsay rule and is, therefore, technically, non-testimonial hearsay." *Rollins*, 161 Md.App. at 66, 866 A.2d at 945 (footnote omitted). The Court of Special Appeals classified the autopsy report as a business record pursuant to Md.Code, Health General Article, § 5–311, and as such held that "the unavailability of the witness and prior opportunity for cross-examination required in [a] case of 'testimonial' hearsay are not rights, under *Crawford*, which attach automatically to non-testimonial hearsay." *Id.* at 66–67, 866 A.2d at 945. In other words, business records are not included within the

## The *Crawford* Decision

In Crawford's trial for assault and attempted murder, the tape-recorded statement of Crawford's wife was offered as evidence to rebut Crawford's claim that he attacked the victim in self-defense.[7] At trial, Crawford's wife did not testify because of Washington State's marital privilege.[8] The privilege, however, did not extend to statements made outside of court that were admissible under a hearsay exception, and Crawford's wife's statements were admitted notwithstanding the marital privilege. *Crawford,* 541 U.S. at 40, 124 S.Ct. at 1357–58. Crawford argued that the admission of his wife's out-of-court statement violated his constitutional right to confront the witnesses against him. *Id.* at 40, 124 S.Ct. at 1358. The Supreme Court examined its holding in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), that the right to confrontation will not prevent the admission of a statement made against a criminal defendant by an unavailable witness if the statement possesses "adequate 'indicia of reliability,'" meaning that the statement either "fall[s] within a 'firmly rooted hearsay exception' or bear[s] 'particularized guarantees of trustworthiness.'" *Crawford,* 541 U.S. at 40, 124 S.Ct. at 1358 (quoting *Ohio v. Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539). Primarily, the Court noted that two inferences about the Confrontation Clause could be gleaned from history, the first of which is that the "principal evil" that the Confrontation Clause was meant to address was "the use of *ex parte*

---

enumerated designations of "testimonial statements" outlined by the Supreme Court in *Crawford* that require the unavailability of the witness and prior opportunity for cross-examination for admission. *See Crawford,* 541 U.S. at 68, 124 S.Ct. at 1374 (footnote omitted). We shall discuss this holding *infra.*

7. Crawford's wife stated that she did not see a weapon in the victim's hands before Crawford stabbed the victim. *Crawford,* 541 U.S. at 39–40, 124 S.Ct. at 1357.

8. Washington's marital privilege, at the time *Crawford* was decided, was contained in Wash. Rev.Code § 5.60.060(1) (1994), and generally prevents a spouse from testifying without the other spouse's consent. *See* Md.Code (1974, 2002 Repl.Vol. & 2004 Supp.) § 9–106 of the Courts and Judicial Proceedings Article.

examinations as evidence against the accused." *Id.* at 50, 124 S.Ct. at 1363.

The second inference about the Confrontation Clause, supported by history, is that "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless . . . [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53–54, 124 S.Ct. at 1365. The prior opportunity to cross-examine is a condition precedent for the admissibility of testimonial statements, with some exceptions. The Court stated that this conclusion was not meant

> [to] deny that "[t]here were always exceptions to the general rule of exclusion" of hearsay evidence. . . . But there is scant evidence that exceptions were invoked to admit testimonial statements against the accused in a criminal case. [Most of the hearsay] exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy. We do not infer from these that the Framers thought exceptions would apply even to prior testimony. *Cf. Lilly v. Virginia,* 527 U.S. 116, 134, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality opinion) ("[A]ccomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule").

*Crawford,* 541 U.S. at 56, 124 S.Ct. at 1367 (footnotes omitted).

The text of the Confrontation Clause regarding witnesses against the accused was interpreted by the Court to mean those individuals who "bear testimony" against the accused. *Id.* at 51, 124 S.Ct. at 1364. Noting *Roberts's* conditioning of the admissibility of all hearsay evidence on whether it falls under a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness," the Court found that the *Roberts* test departed from the noted historical inferences about the Confrontation Clause. *Id.* at 60, 124 S.Ct. at 1369. The Court ultimately rejected the *Roberts* test for testimonial statements, concluding that conditioning the admissibility of all hearsay evidence on its "reliability," and leaving the Con-

frontation Clause's protection "to the vagaries of the rules of evidence," was inconsistent with the Framers' intent. *Id.* at 61, 124 S.Ct. at 1370.

While the Supreme Court was reluctant to detail a comprehensive definition of testimonial, it did provide some guidance. The Court noted:

Various formulations of this core class of "testimonial" statements exist: "ex parte in—court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially[;]" "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions[;]" "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]"

*Id.* at 51–52, 124 S.Ct. at 1364 (citations omitted). "Testimony" was defined as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford,* 541 U.S. at 51, 124 S.Ct. at 1364 (quoting 1 N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)). The Supreme Court mentioned that there are multiple examples of "testimonial" statements and remarked particularly that statements taken by police officers in the course of interrogations are testimonial. *Id.* at 52, 124 S.Ct. at 1364. The Court stopped short of establishing a complete definition of what is testimonial, but noted that "prior testimony at a preliminary hearing, before a grand jury, or at a former trial . . . and . . . police interrogations" are considered to be testimonial. *Id.* at 68, 124 S.Ct. at 1374.

We recently discussed *Crawford* and the admission of testimonial statements in connection with the Confrontation Clause in *State v. Snowden,* 385 Md. 64, 867 A.2d 314 (2005). Snowden was arrested, and eventually convicted, on several counts of sexual abuse based on information obtained during an

interview between a sexual abuse investigator with the Mont-gomery County Department of Health and Human Services, and the alleged victims. *Id.* at 69–71, 867 A.2d at 316–17. The State filed a motion to invoke Md.Code (2001), § 11–304 of the Criminal Procedure Article.[9] *Id.* at 73, 867 A.2d at 318–19. The investigator's testimony was found to be sufficient under § 11–304 and was permitted by the trial judge after an examination of the children. *Id.* at 73, 867 A.2d at 319. Snowden objected, arguing that this admission was in violation of his Sixth Amendment right to confrontation, but the trial court overruled his objection and Snowden was found guilty on all counts. *Id.* at 74, 867 A.2d at 319.

In our analysis, we addressed the Supreme Court's categori-zation of "testimonial" statements in *Crawford:*

As the Court noted, these standards share a common nucleus in that each involves a formal or official statement made or elicited with the purpose of being introduced at a criminal trial. *Id.* at 1364, 1367, n. 7 (finding that state-ments are testimonial where "government officers [are in-volved] in the production of testimony with an eye toward trial"). Although these standards focus on the objective quality of the statement made, the uniting theme underlying the *Crawford* holding is that when a statement is made in the course of a criminal investigation initiated by the gov-ernment, the Confrontation Clause forbids its introduction unless the defendant has had an opportunity to cross-examine the declarant. *Id.* at 1364.

*Id.* at 81, 867 A.2d at 324. Analyzing *Crawford,* we opined:

*In the context of "police interrogations,"* we are directed by *Crawford* to conclude that the proper standard to apply to determine whether a statement is testimonial is whether the statements were made under circumstances that would lead an objective declarant reasonably to believe that the state-ment would be available for use at a later trial.

---

9. Section 11–304 is known as the "tender years" statute.

*Id.* at 83, 867 A.2d at 325 (quoting *Crawford, supra,* 541 U.S. at 51, 124 S.Ct. at 1364) (footnote omitted) (emphasis added). We noted that, notwithstanding the children's awareness of why they were being interviewed, "the *express purpose* of bringing the children to the facility to be interviewed was to develop their testimony for possible use at trial." *Id.* at 85, 867 A.2d at 326 (emphasis added.) Disregarding the State's arguments as to the nature of the interviews with the children, we held that, "[n]o matter what other motives exist," if the circumstances of the given statement would lead an objective person to believe that the statements made in response to government interrogation would be used at trial later, the admission of those statements must be subject to the requirements of *Crawford. Id.* at 92, 867 A.2d at 330.

Whether an autopsy report is testimonial in nature pursuant to *Crawford* is an issue of first impression in Maryland. We turn to the decisions of states that have decided this issue and similar issues.

Several jurisdictions have interpreted *Crawford* strictly, finding that reports that do not fall within the three enumerated categories of testimonial statements specified in *Crawford* do not implicate the Confrontation Clause. *See State v. Dedman,* 136 N.M. 561, 102 P.3d 628 (2004) (holding that a blood-alcohol report was not testimonial because it did not fall within the categories of testimonial statements enumerated in Crawford and because the report was not prepared by law enforcement personnel). In *Moreno Denoso v. State,* 156 S.W.3d 166 (Tex.Ct.App.2005), the defendant objected to the admission of an autopsy report because the maker of the report had died and did not testify at trial. *Id.* at 181. The trial court in *Moreno Denoso* found that the autopsy report was admissible as a public record. *Id.* at 180. The court noted that the autopsy report "set forth matters pursuant to a duty imposed by law," and detailed the state of decomposition of the body in addition to observations about the victim's body. *Id.* at 180, 182. The *Moreno Denoso* court found that the autopsy report did not fit within the enumerated categories in *Crawford,* and therefore, it was non-testimonial and admissi-

ble. *Id. See also Mitchell v. State,* No. 04–04–00885–CR, 2005 WL 3477857 (Tex.App. Dec.21, 2005) (finding that an autopsy report is not testimonial evidence in violation of *Crawford* because it is a business record, and therefore, non-testimonial).

*Crawford's* reference to the business records as non-testimonial statements has led other jurisdictions to hold that finding evidence to be a business record automatically excepts that document from Confrontation Clause scrutiny. *See People v. Brown* 9 Misc.3d 420, 801 N.Y.S.2d 709, 712–13 (N.Y.Sup.Ct.2005); *Commonwealth v. Verde,* 444 Mass. 279, 827 N.E.2d 701, 706 (2005); *People v. Hinojos–Mendoza,* No. 03CA0645, slip op. at 11–13, 2005 WL 2561391 (Colo.Ct.App. July 28, 2005). In *People v. Durio,* 7 Misc.3d 729, 794 N.Y.S.2d 863 (2005), the defendant objected to the admission of both the autopsy report of the victim and the testimony of an assistant medical examiner offered in place of the medical examiner who prepared the report. *Durio,* 794 N.Y.S.2d at 864. The court noted that *Crawford* had specifically exempted business records from scrutiny under the Confrontation Clause because they are outside the core class of testimonial statements that were meant to be excluded by the clause. *Id.* at 867. Interpreting *Crawford,* the court in *Durio* stated: "The essence of the business records hearsay exception contemplated in *Crawford* is that such records or statements are not testimonial in nature because they are prepared in the ordinary course of regularly conducted business and are 'by their nature' not prepared for litigation." *Id.* An autopsy report can be considered a business record under New York law based on the rationale that "[r]ecords systematically made for the conduct of a business are inherently highly trustworthy because they are routine reflections of day-to-day operations and because the entrant's obligation is to have them truthful and accurate for purposes of the conduct of the enterprise." *Id.* at 868 (citation omitted). The court in *Durio* gave the following reasoning for the admission of the autopsy report without violation of the Confrontation Clause:

The [Office of the Chief Medical Examiner ("OCME")] is not a law enforcement agency and is "by law, independent of and not subject to the control of the office of the prosecutor." OCME "is required simply to investigate unnatural deaths" and is required to perform autopsies in a number of situations only one of which is when the death is potentially the product of a homicidal act.... OCME is not authorized to gather evidence or determine the identity of a particular perpetrator and is not responsible for enforcing any criminal laws. OCME's independence distinguishes its autopsy reports from the blood test report held to be testimonial in *People v[.] Rogers* (8 A.D.3d 888, 891, 780 N.Y.S.2d 393 [3d Dept 2004]).

The autopsy report in this case was not manufactured for the benefit of the prosecution. Indeed, an autopsy is often conducted before a suspect is identified or even before a homicide is suspected. That it may be presented as evidence in a homicide trial does not mean that it was composed for that accusatory purpose or that its use by a prosecutor is the inevitable consequence of its composition.

*Id.* at 868–69 (some citations omitted). The *Durio* court also noted the practical implications of treating autopsy reports as inadmissible testimonial hearsay:

Years may pass between the performance of the autopsy and the apprehension of the perpetrator. This passage of time can easily lead to the unavailability of the examiner who prepared the autopsy report. Moreover, medical examiners who regularly perform hundreds of autopsies are unlikely to have any independent recollection of the autopsy at issue in a particular case and in testifying invariably rely entirely on the autopsy report. Unlike other forensic tests, an autopsy cannot be replicated by another pathologist. Certainly it would be against society's interests to permit the unavailability of the medical examiner who prepared the report to preclude the prosecution of a homicide case.

*Id.* at 869.

Other jurisdictions, such as those of Ohio, Alabama and Florida have held that classifying evidence that fits within a

hearsay exception, such as business or public records, does not exempt such evidence from scrutiny under the Confrontation Clause pursuant to *Crawford.* In *State v. Crager,* 164 Ohio App.3d 816, 844 N.E.2d 390, 391 (2005), the defendant was convicted of aggravated assault and murder. He challenged the introduction of a DNA report when the analyst who prepared the report was not present to testify. The court found that the report was testimonial under *Crawford* because it was prepared as part of a police investigation and a reasonable person could conclude that it would be available for use at a later trial. *Id.* at 396. The court in *Crager* held that the statement in *Crawford* referring to the business records exception was purely dictum,[10] and "such a statement should [not] control over the [Supreme C]ourt's holding, which involves whether a statement is testimonial or [non-testimonial]." *Id.* at 397. The court also stated that, while some evidence may fall within the general business-records exception, other business records should still be subject to analysis under *Crawford* and be excluded from evidence if they are in fact testimonial. *Id.* at 397.

*Smith v. State,* 898 So.2d 907 (Ala.Crim.App.2004), concerned a defendant's objection to the admission of an autopsy report and evidence admitted without the testimony of the doctor who performed the autopsy. Although the report was admissible as a business record, the court nevertheless held that it violated the Confrontation Clause because it allowed the State to prove cause of death, a crucial element in the case, without providing Smith with the opportunity to cross-

---

**10.** The court's contention in *Crager* that the reference to the business records exception in *Crawford* was purely dictum is not universally adopted, and we do not share that court's view as to the residual value of the Supreme Court's pronouncements. We note that, while not essential to the issue decided in *Crawford,* Justice Scalia's discussion of the business records exception in the context of the Confrontation Clause offers us guidance in the instant case. "Dicta of the United States Supreme Court should be very persuasive." *Fouts v. Maryland Cas. Co.,* 30 F.2d 357, 359 (4th Cir.1929). *See also Wright v. Morris,* 111 F.3d 414, 419 (6th Cir.1997) (noting that dicta is "instructive of the Supreme Court's views and cannot be dismissed out of hand ... [w]here there is no clear precedent to the contrary").

examine the doctor who determined the cause of death. *Id.* at 915–16. The court noted that the testimony offered by the substitute medical examiner allowed the State to prove that the cause of death was asphyxiation, which was contrary to the defendant's claim that the victim died as a result of blows the defendant inflicted in self-defense. This error, however, was deemed harmless. The court observed that the autopsy report did not influence the jury's verdict, because the jury rejected the appellant's self-defense claim and returned a manslaughter verdict. *Id.* at 915 n. 4. *See also Perkins v. State,* 897 So.2d 457, 464 (Ala.Crim.App.2004) (finding that an autopsy report is non-testimonial in nature and, classified as a business record, it "bear[s] the earmark of reliability and probability or trustworthiness").

In *Belvin v. State,* No. 4D04–4235, 922 So.2d 1046, 1054 (Fla.App. 2006), the District Court of Appeal of Florida held that a breath test affidavit, prepared in connection with a breath test that was administered when the defendant was arrested for driving under the influence ("DUI"), was testimonial hearsay and, therefore, inadmissible because petitioner did not have an opportunity to cross-examine the breath test technician. In Florida, the legislature passed laws allowing the state to introduce at trial an affidavit containing the necessary evidentiary foundation for breath test results. *Id.* at 1048–49 (citations omitted). The court in *Belvin* held that, because breath test affidavits are generated by law enforcement for use at a later criminal trial or driver's license revocation proceeding, they fall within the third enumerated category of "testimonial" statements in Crawford, as "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 1050. Rejecting the argument that the breath test affidavit was a public record pursuant to statute, the court in *Belvin* determined that the statutory listing of breath test affidavits under the public records and reports exception to the hearsay rule does not control whether they are testimonial under *Crawford. Id.* at 1050–51. The court agreed with Belvin, holding that the

portions of the breath test affidavit pertaining to the procedures followed by the technician in administering the breath test was precisely the type of evidence considered testimonial in *Crawford. Id.* at 1051.

We find the analysis of the court in *Kansas v. Lackey,* 280 Kan. 190, 120 P.3d 332 (2005), to be persuasive in resolving the issues in the instant case.[11] In *Lackey,* the defendant was charged with premeditated first-degree murder and rape and convicted, in part, based upon DNA evidence. *Lackey,* 120 P.3d at 342. Dr. William Eckert, the medical examiner who performed the autopsy on the victim, died before Lackey's trial. *Id.* at 341. The State's expert, Dr. Erik Mitchell, reviewed Dr. Eckert's report, in conjunction with other evidence, and determined both the cause and time of death. *Id.* The defendant argued that the admission of Dr. Mitchell's expert opinion, based on the autopsy performed by Dr. Eckert, should not have been admitted as it violated the Confrontation Clause. *Id.* at 342. The autopsy report in *Lackey* contained "an external, internal, and microscopic description of the body and did not suggest a date of death." *Id.* at 345. Dr. Mitchell testified that the condition of the victim's body suggested a specific window of time for her death, and that her death was caused by strangulation. *Id.* at 346.

During Dr. Mitchell's testimony, the autopsy report was admitted over objection. The court reasoned that, even though the report was hearsay, it was not subjective, but was "a medical doctor's rendition of what he observe[d]." *Id.*

---

11. We note that the medical examiner in *Lackey* was clearly unavailable because he was deceased at the time of the trial. In the instant case, the issue of unavailability was never determined. In a generic sense, the witness was unavailable because he was no longer employed by the Medical Examiner's office and resided in California. He was not "unavailable" as that term is defined by Maryland Rule 5–804, or clearly beyond the court's jurisdiction. *See* Md.Code (1974, 2002 Repl.Vol.) § 9–303(a) of the Courts and Judicial Proceedings Article (noting the procedure for subpoenaing witnesses located outside of Maryland). As we shall explain *infra,* the unavailability of the medical examiner is not dispositive in determining whether nontestimonial hearsay evidence is admissible.

Using the standards of *Ohio v. Roberts, supra,* the court admitted the autopsy report into evidence. Lackey argued that Dr. Eckert's statements in the autopsy report were inadmissible under *Crawford* because they were testimonial and the defense had no opportunity for cross-examination. The Kansas Supreme Court noted that resolution of this issue involves "multiple layers of analysis, including whether the autopsy report falls under a hearsay exception, whether it was testimonial under *Crawford,* and whether it could be used by the State's expert." *Id.* at 346.

In conducting its analysis, the court in *Lackey* first determined if the autopsy report fell under a hearsay exception; whether the report was testimonial under *Crawford;* and finally, whether the State's expert could use the report. *Id.* The court found, *inter alia,* that the autopsy report fell under the business and official records hearsay exceptions, but was still subject to scrutiny under *Crawford.* The court in *Lackey* compared the autopsy report to the categories of "testimonial statements" enumerated in *Crawford* and also looked to the cases of other jurisdictions for guidance. After noting cases from Alabama, Texas and New York, the court cited to the intermediate appellate court's decision in the instant case, stating that it was the most balanced in its approach:

> Under such an approach, factual, routine, descriptive, and nonanalytical findings made in an autopsy report are [non-testimonial] and may be admitted without the testimony of the medical examiner. In contrast, contested opinions, speculations, and conclusions drawn from the objective findings in the report are testimonial and are subject to the Sixth Amendment right of cross-examination set forth in Crawford. Such testimonial opinions and conclusions should be redacted in the event that the medical examiner is unavailable. No denial of due process arises under this resolution because both parties are granted access to the objective findings of the autopsy report and both parties may proceed to obtain their own expert testimony, opinions, and conclusions based upon the objective findings of the medical examiner performing the autopsy.

*Id.* at 351–55. Ultimately, the court in *Lackey* stated that the cause of death noted in the autopsy report, although testimonial in nature, was merely cumulative because it was an undisputed fact, and was already established through other opinion testimony. *Id.* at 352. The disputed fact in *Lackey* was the *time* of the victim's death. The court noted that the autopsy report did not contain a statement as to how long the victim had been deceased. *Id.* Because the disputed fact of time of death had already been established by evidence other than the autopsy report, the court found that any error in the admission of Dr. Eckert's statements as to the cause of death was harmless. *Id.*

## The Instant Case

A. Does the Autopsy Report Fall Within a Hearsay Exception?

1. The Business and Public Records [12] Exceptions

As we have discussed *supra,* the Supreme Court indicated in *Crawford* that the hearsay exceptions, such as the business records exception, can exempt evidence from scrutiny under the Confrontation Clause. Under Maryland law, "[a] record of the Chief Medical Examiner, or any deputy medical examiner," such as an autopsy report, is considered "competent

---

12. Md.Code (1984, 2004 Repl.Vol.) § 10–611(g) of the State Government Article defines a "public record" as:

(g) *Public record.*—(1) "Public record" means the original or any copy of any documentary material that:

(i) is made by a unit or instrumentality of the State government or of a political subdivision or received by the unit or instrumentality in connection with the transaction of public business; and

(ii) is in any form, including:

1. a card;
2. a computerized record;
3. correspondence;
4. a drawing;
5. film or microfilm;
6. a form;
7. a map;
8. a photograph or photostat;
9. a recording; or
10. a tape.

evidence in any court in this State," if the record is "made by the medical examiner or by anyone under the medical examiner's direct supervision or control." Md.Code (1982, 2005 Repl.Vol.), § 5–311(d)(2) of the Health General Article. Maryland Rule 5–803(b)(6)[13] provides that records of regularly conducted business activities are not excluded by the hearsay rule, even though the declarant is available as a witness:

> Records of Regularly Conducted Business Activity. A memorandum, report, record, or data compilation of acts, events, conditions, opinions, or diagnoses if (A) it was made at or near the time of the act, event, or condition, or the rendition of the diagnosis, (B) it was made by a person with knowledge or from information transmitted by a person with knowledge, (C) it was made and kept in the course of a regularly conducted business activity, and (D) the regular practice of that business was to make and keep the memorandum, report, record, or data compilation. A record of this kind may be excluded if the source of information or the method or circumstances of the preparation of the record indicate that the information in the record lacks trustworthiness. In this paragraph, "business" includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Md. Rule 5–803(b)(6). This exception "represent[s][the] . . . recognition that if records are reliable enough for the running of a business (or a government agency), they are trustworthy enough to be admissible at trial, particularly when one considers the practical difficulty of proving the specific facts contained in many of these records." JOSEPH F. MURPHY, JR. MARYLAND EVIDENCE HANDBOOK, § 804 at 318 (3d ed. 1999). Justice Scalia addressed specifically the nature of statements contained in business records in *Crawford:*

> "This is not to deny, as THE CHIEF JUSTICE notes, that "[t]here were always exceptions to the general rule of exclusion" of hearsay evidence. . . . But there is scant evidence that exceptions were invoked to admit testimonial

---

13. Maryland Rule 5–803(b) was derived from Federal Rule 803.

statements against the accused in a criminal case. M[ost of the hearsay] exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy. We do not infer from these that the Framers thought exceptions would apply even to prior testimony."

*Id.* at 56, 124 S.Ct. at 1367. *See Owens–Illinois, Inc. v. Armstrong,* 326 Md. 107, 112–13, 604 A.2d 47, 49 (1992) (holding that a trial judge "has the discretion to exclude a document that meets the technical requirements of a business record when the objecting party persuades the judge that the document lacks the degree of reliability and trustworthiness that business records are ordinarily assumed to possess.") (footnote omitted); *Ellsworth v. Sherne Lingerie, Inc.,* 303 Md. 581, 604–605, 495 A.2d 348, 360 (1985) (applying the public records exception to the hearsay rule and differentiating between "fact" and "opinion"); *see also* Md.Code (1974 & 2002 Repl. Vol), § 10–204 of the Courts and Judicial Proceedings Article.

 The intermediate appellate court found that any analysis pursuant to Md.Code (1974, 2002 Repl. Vol), § 10–204 of the Courts and Judicial Proceedings Article,[14] governing the

---

14. Section 10-204 provides:

(a) *Admissibility of copies.*—A copy of a public record, book, paper, or proceeding of any agency of the government of the United States, the District of Columbia, any territory or possession of the United States, or of any state or of any of its political subdivisions or of an agency of any political subdivision shall be received in evidence in any court if certified as a true copy by the custodian of the record, book, paper, or proceeding, and if otherwise admissible.

(b) *Provision of copies.*—Except as otherwise provided by law, a custodian of a public record in the State or other person authorized to make a certification under this section shall, upon request, provide a certified copy of the public record to a party to a judicial proceeding or the party's attorney.

(c) *Certification.*—A certification under this section shall include:

(1) The signature and title of the custodian or other person authorized to make the certification;

(2) The official seal, if any, of the office; and

(3) A statement certifying that the copy is a true copy of the public record.

admissibility of public records, would lead to the same result that the court had reached in applying the business records exception. Specifically, factual findings contained in a document deemed to be a public record may be received into evidence so long as the document is certified as being a true copy by the custodian of records. The Court of Special Appeals, in considering the admission of opinions, as distinguished from factual findings, noted our decision in *Ellsworth, supra.*[15]

### a. The Autopsy Report in the Instant Case Was Admissible as Both a Business and a Public Record

■ We find the intermediate appellate court's determination that the report was a business record, and therefore non-testimonial hearsay, to be correct. During the trial in the instant case, the trial judge questioned Dr. Ripple, the deputy

---

(d) *Fee.*—A custodian or other person authorized to make a certification under this section may charge a reasonable fee for providing a certified copy of a public record in accordance with this section.

**15.** In applying the public records exception in *Ellsworth* we differentiated between "fact" and "opinion,"noting:

The line between "fact" and "opinion" is often difficult to draw. An investigating body may hear diametrically opposed testimony on the question of whether one person or another struck the first blow, and proceed to decide the issue as a finding of "fact." That determination necessarily has a judgmental quality, and differs, for example, from a finding of fact that a certain number of persons suffered burns from ignition of clothing fabric during a given period. Conclusions found in reports need not be judgmental.... [A]ttaching labels of "fact" or "opinion" or "conclusion" will not necessarily resolve the issue, and careful attention must be given to the true nature of the statement and the totality of circumstances bearing on the ultimate issue of reliability. Third level hearsay may possess significant indicia of reliability in one case and be clearly unreliable in another.
\* \* \* \*
We agree that the Public Records exception to the hearsay rule appropriately allows the reception of reliable facts, and will be recognized in this state in the form in which it appears at Fed.R.Evid. 803(8). We make clear, however, that the term "factual findings" will be strictly construed and that evaluations or opinions contained in public reports will not be received unless otherwise admissible under this State's law of evidence.
*Id.* at 609–610, 612, 495 A.2d at 362, 363–64 (footnotes omitted).

medical examiner, about the procedure surrounding the making of the autopsy report:

[THE COURT]: The fact is that you have a medical report before you, correct?

[DR. RIPPLE]: Yes.

[THE COURT]: And when you are talking about protocol, all you know is what is on that report, correct?

[DR. RIPPLE]: I know what is on this report and what is in the file.

[THE COURT]: All right. And that report is required by law to be kept in the course of business, correct?

[DR. RIPPLE]: Yes, Your Honor.

[THE COURT]: So the entries on there are made in accord with the statute that requires the record to be kept, right?

[DR. RIPPLE]: Yes, Your Honor.

Dr. Ripple testified that the autopsy reports and file were records kept during the regularly conducted business activity of the Office of the Chief Medical Examiner and that the rough body drawings and notations taken during the autopsy that she referenced were materials that are regularly relied upon in the field in order to come to a conclusion or opinion.

The autopsy report in the instant case meets the definition of "record" provided by section 5–311(d) [16] of Health General Article, in addition to the definition of "record" provided in Md.Code (1974, 2002 Repl.Vol.), § 10–101(b) of the Courts and Judicial proceedings Article.[17] Here, we find no error in the

---

**16.** Section 5–311(d) defines "record" as:

(d) *Evidence.*—(1) In this subsection, "record":

(i) Means the result of a view or examination of or an autopsy on a body; and

(ii) Does not include a statement of a witness or other individual.

(2) A record of the office of the Chief Medical Examiner or any deputy medical examiner, if made by the medical examiner or by anyone under the medical examiner's direct supervision or control, or a certified transcript of that record, is competent evidence in any court in this State of the matters and facts contained in it.

**17.** Section 10–101 provides:

trial judge's determination that the autopsy report was a business record. There is no suggestion apparent from the record that the autopsy report is unreliable or untrustworthy. The purpose for which the autopsy report was prepared was, primarily, to satisfy the statutory requirements of the Health General Article.

B. Notwithstanding Its Designation as Both a Business and Public Record, is the Redacted Autopsy Report Testimonial?

In reviewing the enumerated formulations of the core class of "testimonial" statements, it is clear that Dr. Pestaner's autopsy report does not fit within the first two categories of the core class of "testimonial" statements determined by the Supreme Court in *Crawford.* It is neither *ex parte* in-court testimony or its functional equivalent, a custodial examination, prior testimony, nor an extrajudicial statement contained in formalized testimonial materials. We find that the only category under which the autopsy report might fall is that of "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." The information that was not redacted from the autopsy report, while it might eventually be used in a criminal trial, was not created for that express purpose, and was statutorily required to be determined by the medical examiner and placed into the

---

(a) *Definition of "business."*—"Business" includes business, profession, and occupation of every kind.

(b) *Admissibility.*—*A writing or record made in the regular course of business as a memorandum or record of an act, transaction, occurrence, or event is admissible to prove the act, transaction, occurrence, or event.*

(c) *Time of making records.*—The practice of the business must be to make such written records of its acts at the time they are done or within a reasonable time afterwards.

(d) *Lack of knowledge of maker.*—The lack of personal knowledge of the maker of the written notice may be shown to affect the weight of the evidence but not its admissibility.

(Emphasis added.)

report pursuant to § 5–311 of the Health General Article.[18]

---

**18.** The responsibilities of a medical examiner with deaths that require investigation are outlined in Md.Code (1982, 2005 Repl. Vol.), § 5–309 of the Health General Article, which states in pertinent part:

(a) *Deaths to be investigated.*—(1) A medical examiner shall investigate the death of a human being if the death occurs:

(i) By violence;

(ii) By suicide;

(iii) By casualty;

(iv) Suddenly, if the deceased was in apparent good health or unattended by a physician; or

(v) In any suspicious or unusual manner.

\* \* \* \*

(b) *Notification of medical examiner.*—If a medical examiner's case occurs, the police or sheriff immediately shall notify the medical examiner and State's Attorney for the county where the body is found and give the known facts concerning the time, place, manner, and circumstances of the death.

(c) *Investigation by a medical examiner.*—Immediately on notification that a medical examiner's case has occurred, the medical examiner or an investigator of the medical examiner shall go to and take charge of the body. The medical examiner or the investigator shall investigate fully the essential facts concerning the medical cause of death and, before leaving the premises, reduce these facts and the names and addresses of witnesses to writing, which shall be filed in the medical examiner's office.

(d) *Evidence.*—The medical examiner or the investigator shall take possession of and deliver to the State's Attorney or the State's Attorney's designee any object or article that, in the opinion of the medical examiner or the investigator, may be useful in establishing the cause of death.

The person who performs the autopsy must "prepare detailed written findings during the progress of the autopsy" that are required to be "filed in the office of the medical examiner for the county where the death occurred[, with t]he original copy of the findings and conclusions" to be filed in the Chief Medical Examiner's office. Md.Code (1982, 2005 Repl.Vol.), § 5–310(d)(1) of the Health General Article. The duties of the Chief Medical Examiner in regard to records is detailed in Md.Code (1982, 2005 Repl.Vol.), § 5–311 of the Health General Article, which provides in part:

(a) *Content.*—(1) The Chief Medical Examiner and, as to their respective counties, each of the deputy medical examiners shall keep complete records on each medical examiner's case.

(2) The records shall be indexed properly and include:

(i) The name, if known, of the deceased;

(ii) The place where the body was found;

(iii) The date, cause, and manner of death; and

(iv) All other available information about the death.

(b) *Report of medical examiner and autopsy.*—The original report of the medical examiner who investigates a medical examiner's case and

Unlike the interview in *Snowden*, the express purpose for the preparation of the autopsy report was not for use in a criminal trial.[19] It is clear that there is a statutory duty to prepare such a report when a death has occurred in "any suspicious or unusual manner." Md.Code (1982, 2005 Repl.Vol.), § 5–309(b) of the Health General Article.

At the occurrence of a suspicious death, the medical examiner is required to make a determination as to cause of death and to generate an autopsy report. This determination is not always used at a later criminal trial. When the report is offered as evidence against the defendant at trial, in a criminal case, we conclude that an autopsy report is not *per se* "testimonial" in light of *Crawford*. The trial court must determine whether the report contains testimonial or non-testimonial hearsay statements. The testimonial statements may not be admitted against the defendant at trial, unless the declarant is

---

the findings and conclusions of any autopsy shall be attached to the record of the medical examiner's case.

(c) *Delivery to the State's Attorney.*—The Chief Medical Examiner or, if the Chief Medical Examiner is absent or cannot act, the Deputy Chief Medical Examiner or an assistant medical examiner, and each deputy medical examiner promptly shall deliver to the State's Attorney for the county where the body was found a copy of each record that relates to a death for which the medical examiner considers further investigation advisable. A State's Attorney may obtain from the office of a medical examiner a copy of any record or other information that the State's Attorney considers necessary.

(d) *Evidence.*—(1) In this subsection, "record":

 (i) Means the result of a view or examination of or an autopsy on a body; and

 (ii) Does not include a statement of a witness or other individual.

 (2) A record of the office of the Chief Medical Examiner or any deputy medical examiner, if made by the medical examiner or by anyone under the medical examiner's direct supervision or control, or a certified transcript of that record, is competent evidence in any court in this State of the matters and facts contained in it.

19. We also distinguish *Snowden* from the instant case on the grounds that the out-of-court statements in *Snowden*, accusatory statements from the victims alleging sexual abuse by the defendant, clearly fit within one of the enumerated categories of testimonial statements in *Crawford*.

unavailable and there was a prior opportunity for cross-examination.

### 1. Contested Conclusions of Opinions vs. Non–Analytical Findings That Are Objectively Ascertained

 Petitioner contends Dr. Pestaner's remaining statements in the autopsy report were contested conclusions, rather than non-analytical findings, and thus were testimonial in nature, per *Crawford*, because they proved an element of the crime and should not have been admitted without allowing petitioner to confront Dr. Pestaner. We disagree.

Although Dr. Pestaner was not present to testify, we conclude that the statements included in the autopsy report, as admitted, were findings as to the physical condition of Ms. Ebberts's body. They were non-analytical findings that we do not view to be part of the core class of testimonial statements that the Confrontation Clause is intended to prevent. The "findings" included in the autopsy report to which petitioner objects include:[20] (1) that there was a superficial hemorrhage on the gumline of Ms. Ebberts, (2) that there were fresh bruises on Ms. Ebberts's arms, and (3) that Ms. Ebberts's corneas were cloudy. Petitioner argues whether something is cloudy or not is a matter of interpretation. Rollins also

---

**20.** Petitioner also objects to Dr. Ripple's consideration of Dr. Pestaner's handwritten notes with regard to an observation of "greenish discoloration" on Ms. Ebberts's abdomen, a decompositional change that can aid in determining the time of death of a victim. While Dr. Pestaner noted that he observed greenish discoloration on Ms. Ebberts's abdomen, he did not include this information in the autopsy report. As we state in part II of this opinion, we find no error in Dr. Ripple's consideration of Dr. Pestaner's notes, which would include any notes that refer to "greenish discoloration" of Ms. Ebberts's abdomen. Consideration of the entire medical examiner's file on a particular victim, including the notes, is a common practice among medical examiners, and medical experts, in rendering an expert opinion as to cause of death. Dr. Ripple testified such consideration was the standard practice, and petitioner has not contradicted that statement.

Insofar as Dr. Pestaner's notes would have required Dr. Pestaner to be present for cross-examination, we disagree. Petitioner has failed to show the significance of the omission of this fact from the autopsy report.

argues that he should have had the opportunity to cross-examine Dr. Pestaner to determine whether the corneal cloudiness noted in the autopsy report could have occurred during the refrigeration of Ms. Ebberts's body before the autopsy was performed. At oral argument in this Court, defense counsel stressed the subjectivity of this classification. The autopsy report simply stated, "The corneae were cloudy." The defense expert, Dr. James Frost, medical examiner for the State of Delaware, testified that he observed "the very slightest amount of corneal clouding which is a post-mortem change." Dr. Frost went on to opine that if Ms. Ebberts had been dead for three days and her eyes had been open, there would be extensive corneal clouding.

The Court of Special Appeals rejected Rollins's contention that characterizations in the autopsy report such as "chronic," "acute," and "cloudy" are matters of interpretation that, accordingly, constitute opinions. The court characterized those terms as "descriptive," and stated that such terms "may be objectively quantified; thus, they are not subject to significantly different interpretations by the witnesses. More importantly, the descriptive terms in question only tangentially touch upon the matters in dispute regarding *corpus delecti* or criminal agency." *Rollins, supra,* 161 Md.App. at 79, 866 A.2d at 952. The intermediate appellate court reviewed the report regarding the eleven major systems of Ms. Ebberts's body [21]

---

21. The intermediate appellate court noted the following three sections of the autopsy report as "illustrative of the medical examiner's findings of the condition of the deceased which were objectively ascertained, generally reliable, and normally undisputed."

HEAD: (CENTRAL NERVOUS SYSTEM)
The scalp is reflected. The calvarium of the skull was removed. The dura mater and falx cerebri were intact. There was no epidural or subdural hemorrhage present. The leptomeninges were thin and delicate. The cerebral hemispheres were symmetrical and congested. These structures at the base of the brain, including cranial nerves and blood vessels, were intact. Coronal sections through the cerebral hemispheres revealed no lesions. Transverse sections through the brainstem and cerebellum were unremarkable. The brain weighed 1320 grams.
CARDIOVASCULAR SYSTEM:

and concluded that the findings were "virtually all descriptive, rather than analytical." *Id.* (Footnote omitted.) The Court of Special Appeals ultimately held:

> We hold that the findings in an autopsy report of the physical condition of a decedent, which are routine, descriptive and not analytical, which are objectively ascertained and generally reliable and enjoy a generic indicium of reliability, may be received into evidence without the testimony of the examiner. Where, however, contested conclusions or opinions in an autopsy report are central to the determination of *corpus delecti* or criminal agency and are offered into evidence, they serve the same function as testimony and trigger the Sixth Amendment right of confrontation.

*Id.* at 82, 866 A.2d at 954.

The autopsy report in the instant case was redacted to omit any information that could be construed as an "opinion." In its discussion of hearsay exceptions in the context of the

---

> The pericardial surfaces were smooth, [g]listening and unremarkable; the pericardial sac was free of significant fluid and adhesions. The coronary arteries arose normally, followed to the usual distribution and had atherosclerosis as follows: left anterior descending artery and left circumflex artery with 10–30% stenosis and the right coronary artery had 50–60% stenosis. The chambers and valves exhibited the usual size position relationship and were unremarkable. The left ventricular free wall was 1.6 cm in thickness. The myocardium was dark red-brown, firm and unremarkable; the atrium and ventricular septa were intact. The aorta and its major branches arose normally, followed the usual course, and had marked atherosclerosis. The venae cavae and their major tributaries returned to the heart in the usual distribution and were free of thrombi. The heart weighed 350 grams.
> RESPIRATORY SYSTEM:
> The upper airway was clear of debris and foreign material; the mucosal surfaces were smooth, had scattered erythema with yellow mucus in branching airways. The pleural surfaces had posterior adhesions with scattered bullae that were up to 5 cm. The pulmonary parenchyma was red-purple, exuding slight to moderate amounts of frothy edema; the right middle lobe was focally firm and had dark discoloration. The pulmonary arteries were normally developed, patent and without thrombus or embolus. The right lung weighed 610 grams; the left 490 grams.

*Rollins,* 161 Md.App. at 79–80 n. 12, 866 A.2d at 952–53 n. 12.

Confrontation Clause in *Crawford*, the Supreme Court referred to "exceptions that covered statements that by their nature were not testimonial." The redaction of the autopsy report places the report into the category of non-testimonial hearsay as contemplated by the Supreme Court. We are not convinced that Dr. Pestaner's specific findings that remained in the autopsy report were of the type that amounted to "contested conclusions," and the defense has presented no case law that supports that contention. The Court of Special Appeals rejected Rollins's contention that, absent the testimony of the person who prepared an autopsy report, the distinction between fact and opinion in an autopsy report no longer plays a role in determining whether the admission of that report violates the accused's right to confrontation. *Rollins*, 161 Md.App. at 76, 866 A.2d at 950 (footnote omitted). In doing so, the court stated: "Contrary to [Rollins's] position, 'fact' as defined in [*Ward v. State*, 76 Md.App. 654, 547 A.2d 1111 (1988)], continues to be squarely within the firmly fixed exceptions to the hearsay rule. The objectively obtained findings of the physical condition of the victim, not subject to interpretation, constitute the 'facts.' " *Id.*

Although the *Ward* case is distinguishable in that it involved psychiatric evaluations,[22] the case is illustrative. We noted in *Ward* that "the fact that a hospital record may be generally admissible as a business record, against either a hearsay or confrontation objection, does not necessarily mean that each

---

**22.** In *Ward*, the State called an expert witness to rebut expert testimony presented by Ward that he suffered from Post Traumatic Stress Syndrome and was legally insane at the time he shot the victim to death. *Ward*, 76 Md.App. at 657, 547 A.2d at 1112. The expert doctor was a part of a multi-disciplinary team that consisted of additional psychiatrists, psychologists, one social worker, one occupational therapist, and one nurse. *Id.* Each psychiatrist and psychologist diagnosed Ward's mental state independently and the team met and voted on Ward's official diagnosis. *Id.* at 657, 547 A.2d at 1112–13. Over objection, the expert witness testified that the vote on Ward's condition was unanimous, and Ward complained that the doctor has effectively testified, not only to his own diagnosis, but also to the diagnoses of the other psychiatrists and psychologists on the team who were not called to testify at trial. *Id.* at 657, 547 A.2d at 1113.

and every entry in it is so admissible." *Id.* at 659–60, 547 A.2d at 1114. The Court of Special Appeals relied upon *Gregory v. State,* 40 Md.App. 297, 391 A.2d 437 (1978), quoted with approval in *State v. Garlick,* 313 Md. 209, 220–21, 545 A.2d 27, 32 (1988):

> "The mere fact that a document is part of a hospital record made in the ordinary course of the hospital's business, and may therefore be admissible under the hearsay rule, does not *ipso facto* make its admission comply with the confrontation requirement. . . .
>
> We have here not the routine record of a person's birth, or death, or body temperature, nor any other similar statement of fact or condition objectively ascertained, generally reliable and normally undisputed, and free from any motive to record falsely. We are dealing with the opinions of supposed expert witnesses, who, in this document, are giving testimony not only as to appellant's mental condition, but, more importantly, as to whether or not he is criminally responsible."

*Id.* at 660, 547 A.2d at 1114 (quoting *Gregory, supra,* 40 Md.App. at 325–26, 391 A.2d at 454). As noted in *Ward,* the intermediate appellate court in *Gregory* focused on the recognition that psychiatry is not an exact science and that opinions as to mental condition vary widely. *Id.* at 660–61, 547 A.2d at 1114. The court in *Ward* noted that the issue of a criminal defendant's mental condition was highly contentious and

> [t]his kind of diagnosis does not lend itself to objective confirmation. It is not something that can be validated by microscopic, chemical, or other precise scientific examination but remains primarily a matter of opinion based principally upon a trained professional's evaluation of the subject's behavior and responses to psychological testing. Unlike the kinds of medical facts noted in *Gregory* or medical conclusions having a more objective foundation, such as blood tests, this kind of opinion, especially where

contested, is not so cloaked with a substantial indicium of reliability as to escape the need for confrontation.

*Id.* at 661, 547 A.2d at 1114.

In the instant case, the disputed statements in the autopsy report made by Dr. Pestaner focused on conditions that could be physically observed, rather than a mental diagnosis, such as the one at issue in *Ward*, which was highly subjective in nature. The observations of Dr. Pestaner are more in line with the findings of medical examiners that constitute non-analytical findings that are objectively ascertained i.e., the determination and description of the weight, characteristics and description of the deceased.

Petitioner objected to the fact that Sergeant Rose Brady, a detective of the Baltimore County Homicide Division, sent Dr. Pestaner a facsimile transmission.[23] In addition,

---

**23.** Petitioner claims that he was denied the opportunity to question Dr. Pestaner as to the impact that the facsimile transmission had on his determination of cause of death. Any such examination, at best, would have affected only the weight of the evidence and not the admissibility of the autopsy report itself. Because Dr. Pestatner's conclusions as to smothering and cause and manner of death were redacted from the report, any alleged influence upon Dr. Pestaner to conclude that Ms. Ebberts was smothered was no longer an issue in the case.

Sergeant Brady sent the facsimile before Dr. Pestaner completed his autopsy findings. The fax stated: "Joe, please review. This guy is too dangerous to leave out. We are . . . getting the murder warrant for him, without cause of death."

The record of the pre-trial hearing concerning the communications between Sgt. Brady and Dr. Pestaner shows that defense counsel also had corresponded with Dr. Pestaner, at least twice prior to trial. In addition, defense counsel conceded during his examination of Dr. Ripple that he had talked with Dr. Pestaner about the case prior to the motions hearing. On October 20, according to notations contained in the activity log portion of the medical examiner's files, Dr. Pestaner indicated on the death certificate that the cause of death was pending completion of the autopsy. On October 22, Sgt. Brady sent Dr. Pestaner the fax transmission indicating that she planned to charge Rollins with murder without a finding as to cause of death. There was testimony that Dr. Pestaner was ready to officially report his findings as to cause of death as of October 22; however he waited to report those findings pending further discussions with the detectives involved in the case. Finally, on October 26, Sgt. Brady asked Dr. Pestaner to wait

petitioner objected to several objective findings made by Dr. Pestaner contained in the autopsy report.[24]

until Monday to officially amend the death certificate and release the cause of death.

The motions judge was aware of this background information surrounding the official reporting of the cause of death. He evaluated the report carefully and redacted from the autopsy report those conclusions, evaluations, or opinions that were testimonial in nature. The parties agreed that those redactions did in fact occur. Ordinarily, if the trial judge concludes that the "source of information or the method or circumstances of the preparation of the [autopsy] report indicate[s] that the information in the report lacked trustworthiness[,]" the court may refuse to admit the autopsy report into evidence. Rule 5–803(6). In this case, no such finding was made and the trial judge did not err in admitting the redacted report into evidence. As to the Confrontation Clause analysis, Rollins makes no specific contention that the communications between Sgt. Brady and Dr. Pestaner were either testimonial or hearsay. *See Marquardt v. State,* 164 Md.App. 95, 882 A.2d 900 (2005) (noting that for Confrontation Clause anaylsis, "if . . . [the statement] is nontestimonial it need only conform to Maryland's rules regarding hearsay").

Furthermore, pursuant to *Crawford,* where utterances are not being offered for their truth then they are not testimonial evidence in any sense and the admission of those utterances do not implicate the Confrontation Clause. *See Crawford,* 541 U.S. at 51, 124 S.Ct. at 1364. Thus, *Roberts* is still good law where testimonial statements are not involved. *Crawford v. Washington,* 541 U.S. at 55–56, 124 S.Ct. at 1366–67. In the instant case, neither the facsimile transmission from Sgt. Brady, nor the evidence of conversations between Dr. Pestaner and the detectives were offered for their truth. Instead, both were offered to show that the police influenced Dr. Pestaner's ultimate determination of Ms. Ebberts's cause of death. Consequently, per *Crawford,* both communications were neither testimonial evidence nor hearsay and did not implicate the Confrontation Clause.

Finally, during the investigation of a suspicious death, we do not endorse any communication between the police and the Medical Examiner's Office that exceeds the boundaries established by law. We can only base our review of the nature of the facsimile transmission sent in the instant case on what is contained in the record, and we note that neither party subpoenaed either Dr. Pestaner or Sgt. Brady. We cannot find any evidence, beyond mere suggestion, that there was inappropriate contact between Sgt. Brady and Dr. Pestaner. The facsimile alone does not amount to substantive evidence of any inappropriate behavior. Both Maryland common and statutory law permit a medical examiner to consider information obtained from detectives as a result of the investigation of a suspicious death and the law permits communication between the offices.

**24.** Petitioner also objected to Dr. Pestaner's indication of a hemorrhage on Mrs. Ebberts's gum line. With regard to the hemorrhages, petition-

One of the objective findings to which petitioner objected was the cloudiness of Ms. Ebberts's corneae. While Dr. Pestaner noted only that the corneae were cloudy, the defense did not establish that this classification was outside the normal realm of determinations of the medical examiner, nor did it demonstrate that it would have been more appropriate for Dr. Pestaner to describe the corneae in incremental degrees of cloudiness. The defense was able to present its own expert witness who, upon viewing the photos of Ms. Ebberts's eyes, came to a different conclusion about the degree of cloudiness in the corneae. Findings, such as those made by Dr. Pestaner with regard to the cloudiness of the corneae, were not only observable by an experienced medical examiner,[25] but in this case were corroborated by photographs of the victim's eyes. In fact, Dr. Frost, medical expert for the defense, used the same photos to view Ms. Ebberts's corneae and make his own determination that Ms. Ebberts's corneae were cloudy, but only slightly so.

The nature of Dr. Pestaner's determination was that of a State required and regulated, autopsy examination in which Dr. Pestaner was charged by law with examining the victim and determining the manner and cause of death.[26] As Chief Medical Examiner, Dr. Pestaner's experience in making these types of assessments was undoubtedly sufficient. The determination of corneal cloudiness made by Dr. Pestaner was descriptive of the perceived condition of the victim's eyes at

---

er notes that Dr. Pestaner did not photograph or diagram the hemorrhages. We fail to see the import of the amount of documentation Dr. Pestaner employed in noting this injury. Dr. Pestaner described the location of the hemorrhage and took microscopic samples of tissue from the hemorrhage. There was no evidence in the record that this practice was uncommon or suspect.

**25.** Dr. Ripple was asked by the trial judge if the cloudiness of the corneae was something that she could personally observe, and Dr. Ripple answered that she could.

**26.** Medical examiners are required to record the date, cause and manner of death of an individual by Md.Code (1982, 2005 Repl.Vol.), § 5–311(a)(2)(iii) of the Health General Article. *See*

the time reported. Moreover, our review of the record indicates that the trial judge was fairly thorough and meticulous in his monitoring of the testimony of Dr. Ripple to prevent contested conclusions and opinions from being admitted, and in the admission of the redacted autopsy report and related documents, and at all times observed Rollins's right to confrontation. Dr. Pestaner's determinations generally were routine, descriptive, and generally reliable, and as such, was not testimonial. This type of information was properly admitted into evidence through the autopsy report without Dr. Pestaner's testimony.

2. The Autopsy Report, as Redacted, Was Not Testimonial; Autopsy Reports Are Not *Per Se* Testimonial

The opinion statements in the autopsy report were redacted. We reject petitioner's contention that an autopsy report is *per se* testimonial pursuant to *Crawford*, and should never be admitted into evidence without the testimony of the author of the report. First, we note that Maryland common law supports the contention that factual findings as to the physical condition of the victim's body, as described in an autopsy report, may be admitted without the testimony of the person who prepared the report without violating the Confrontation Clause. *See Bowers v. State*, 298 Md. 115, 136–37, 468 A.2d 101, 112 (1983).[27]

---

**27.** Bowers was convicted of the first-degree premeditated murder of Monica McNamara. *Bowers*, 298 Md. at 120–21, 468 A.2d at 104. Bowers gave the Maryland State Police a statement in which he admitted to having sexual intercourse with the victim, but claimed that it was his accomplice who strangled her. *Id.* at 122, 468 A.2d at 105. Among other things, Bowers argued that his constitutional right to confront the witnesses against him was violated by the admission of the autopsy report, unaccompanied by the testimony of the medical examiner who prepared it. *Id.* at 136, 468 A.2d at 112.

We concluded that the admission of the report did not violate Bowers's constitutional rights. In support of our conclusion, we referred to the decision of the Court of Special Appeals in *Grover v. State*, 41 Md.App. 705, 398 A.2d 528 (1979). In *Grover*, the State introduced into evidence an autopsy report that contained a statement by a doctor who did not testify at trial. The Court of Special Appeals in *Grover* discounted the defendant's use of *Gregory v. State*, 40 Md.App. 297, 391 A.2d

Secondly, we note the impractical implications to classifying autopsy reports as inadmissible testimonial hearsay because the person who prepared them is not present to testify. As noted in *Durio*, years may pass between the performance of the autopsy and the apprehension of the perpetrator that can easily lead to the unavailability of the examiner who prepared the autopsy report. At oral argument, in this Court, defense counsel was given a hypothetical about a situation in which the maker of an autopsy report dies before the date of trial. Defense counsel stated that, even in that situation, the maker of the autopsy report would still be required to meet *Crawford* standards, and in the maker's absence, the State would be required to prove the victim's death in another manner. This is unacceptable in practical application and is not supported by *Crawford*.

In the present case, the Circuit Court had before it an autopsy report prepared by the Maryland Medical Examiner's Office that is otherwise admissible as a business record or as a public record pursuant to Md. Rule 5–803(b)(6) and Md.Code (1974 & 2002 Repl. Vol), § 10–204 of the Courts and Judicial Proceedings Article. As we have already discussed, the statutorily required information contained in the autopsy report, as a business record, was not testimonial in nature, and therefore, did not violate Rollins's right to confrontation. We note the Supreme Court's statement in *Crawford:* "Where [nontestimonial] hearsay is at issue, it is wholly consistent with the

---

437 (1978), for the premise that the introduction of a document prepared in whole or in part by a party not present to testify in court violated Grover's Sixth Amendment right to confrontation. The documents at issue in *Gregory* were various medical reports in which Gregory's mental capacity was evaluated. Due to the frequent differences of opinion in the field of forensic psychiatry, the Court of Special Appeals held that the opportunity to cross-examine a witness giving an opinion in that field would be very important. *Grover*, 41 Md.App. at 710, 398 A.2d at 531. Both this Court in *Bowers*, and the Court of Special Appeals in *Grover*, factually distinguished each case on the basis that the submitted autopsy reports contained only "findings as to the physical condition of the victim" and not opinions, and thus the admission of the reports without the testimony of their respective authors was permissible. *Bowers*, 298 Md. at 137, 468 A.2d at 112; *Grover*, 41 Md.App. at 710–11, 398 A.2d at 531.

Framers' design to afford the States flexibility in their development of hearsay law . . . as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Id.* at 68, 124 S.Ct. at 1374. Here, petitioner has failed to demonstrate that the remaining contested statements in the redacted autopsy report are testimonial and, thus, subject to scrutiny under the Confrontation Clause.

■ Although an autopsy report may be classified as both a business and a public record, it is the contents of the autopsy report that must be scrutinized in order to determine the propriety of its admission into evidence without the testimony of its preparer. If the autopsy report contains only findings about the physical condition of the decedent that may be fairly characterized as routine, descriptive and not analytical, and those findings are generally reliable and are afforded an indicum of reliability, the report may be admitted into evidence without the testimony of its preparer, and without violating the Confrontation Clause. If the autopsy report contains statements which can be categorized as contested opinions or conclusions, or are central to the determination of the defendant's guilt, they are testimonial and trigger the protections of the Confrontation Clause, requiring both the unavailability of the witness and prior opportunity for cross-examination.

II. If preserved, did the trial court err in allowing the medical examiner to render an expert opinion regarding the cause and time of death of Ms. Ebberts?

Rollins argues that Dr. Ripple should not have been permitted to testify as to the cause and time of Ms. Ebberts's death. Primarily, Rollins contends that, pursuant to Md. Rule 5–702, Dr. Ripple's testimony based upon Ms. Ebberts's file, lacked a sufficient factual basis. As to the time and cause of Ms. Ebberts's death, Rollins disputes Dr. Ripple's reliance on some contents of the medical examiner's file with regard to Ms. Ebberts and her review of all information surrounding the death, including information about the police investigation, in order to render her opinion. Rollins alleges that Dr. Ripple

was allowed to "render an expert opinion as to petitioner's guilt" and that her testimony lacked the required factual basis per Md. Rule 5–702.

■ Preliminarily, we must address the State's contention, contained in its cross-petition, that Rollins did not preserve his claim that the trial court improperly allowed Dr. Ripple's opinion that Ms. Ebberts died "during the robbery." Defense counsel's objections to multiple aspects of Dr. Ripple's testimony, specifically with regard to Ms. Ebberts's cause of death, were clear upon review of the record. The defense objected to the questions both before and after the disputed statement,[28] but did not object to the statement itself. Objections to opinion testimony must be made in a timely manner or else they are considered waived and not preserved for appellate review. Md. Rule 4–323(a) ("An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived."). Because defense counsel did not object to, or move to strike, the unresponsive statement, i.e., that Ms. Ebberts died "during the robbery," we hold that petitioner waived any objection as to the time of death testimony. Thus, the remaining contention related solely to the cause of death and the factual basis to support Dr. Ripple's conclusions as to cause of death.

■ Expert testimony is governed by Md. Rule 5–702 which provides:

---

**28.** The following occurred during the period of questioning at issue:
[THE STATE]: Are you able to say to a reasonable degree of medical probability or certainty as to the cause of death of Irene Ebberts?
[DEFENSE COUNSEL]: Objection.
[THE COURT]: Overruled.
[DR. RIPPLE]: To a reasonable degree of medical certainty Irene Ebberts died of asphyxia during the robbery and the physical findings indicate smothering.
[THE STATE]: Now, can you explain—I know you stated all the things upon which you base your opinion. Can you explain those and then how they relate to the expression of your opinion?
[DEFENSE COUNSEL]: Objection.

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

We look to Md. Rule 5–703 to determine the bases of expert opinion testimony:

(a) **In General.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

(b) **Disclosure to Jury.** If determined to be trustworthy, necessary to illuminate testimony, and unprivileged, facts or data reasonably relied upon by an expert pursuant to section (a) may, in the discretion of the court, be disclosed to the jury even if those facts and data are not admissible in evidence. Upon request, the court shall instruct the jury to use those facts and data only for the purpose of evaluating the validity and probative value of the expert's opinion or inference.

(c) **Right to Challenge Expert.** This Rule does not limit the right of an opposing party to cross-examine an expert witness or to test the basis of the expert's opinion or inference.

We set forth the standard of review for the qualification of experts in *I.W. Berman Properties v. Porter Bros. Inc.*, 276 Md. 1, 344 A.2d 65 (1975):

The determination by the trial court of 'the experiential qualifications of a witness will only be disturbed on appeal if

there has been a clear showing of abuse of the trial court's discretion.' *Continental Ins. Co. v. Kouwenhoven,* 242 Md. 115, 126, 218 A.2d 11, 17 (1966), *citing Turner v. State Roads Comm'n.,* 213 Md. 428, 433, 132 A.2d 455, 457 (1957). See also 2 J. WIGMORE, EVIDENCE, s 561, at 643 (3d ed. 1940).

\* \* \* \*

[T]he determination of whether a witness is qualified as an expert witness is generally within the discretion of the court, and will not be overturned unless his discretion has been manifestly abused to the prejudice of the complaining party. *M.₊₁. Realty Co. v. State Roads Commission,* 247 Md. 522, 233 A.2d 793 (1967); *State Roads Commission v. Creswell,* 235 Md. 220, 201 A.2d 328 (1964); *Turner v. State Roads Commission,* 213 Md. 428, 132 A.2d 455 (1957).

\* \* \* \*

▮▮▮▮ In exercising the wide discretion vested in the trial courts concerning the admissibility of expert testimony, a critical test is 'whether the expert's opinion will aid the trier of fact.' *Consolidated Mech. Contrs., Inc. v. Ball,* 263 Md. 328, 338, 283 A.2d 154, 159 (1971)[.]

*Id.* at 12–14, 344 A.2d at 73–74 (some internal citations omitted). When determining whether an expert's testimony will assist the trier of fact, the court is required to determine "(1) whether the witness is qualified as an expert by knowledge, skill, experience, training or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony." *Buxton v. Buxton,* 363 Md. 634, 650, 770 A.2d 152, 161 (2001) (citation omitted).

Dr. Ripple was certified by the court, without objection, in the field of forensic pathology. She was asked about Ms. Ebberts and testified: "To a reasonable degree of medical certainty Irene Ebberts died of asphyxia during the robbery and the physical findings indicate smothering." The defense did not object to this statement when it was made nor did it ask to have the statement stricken from the record. As stated

*supra,* petitioner waived his objection as to time of death testimony. When asked what elements she based her opinion upon, Dr. Ripple stated:

[DR. RIPPLE:] I will start by her physical findings, her natural disease processes. She is a debilitated, sick individual. So you have to look at her natural disease processes and be able to exclude them as a cause of death. So that involves medical records and then the physical findings that I went through with her pneumonia, her emphysema and her heart disease. There is a difference between dying with disease and dying of disease. So with regard to the natural disease processes going on, that is the first thing.

The second thing would be the investigation findings at the scene. You can't work in a vacuum. You need all those pieces. So the investigative findings indicate that foul play had occurred, that foul play being the robbery and ransacking of the house and, in addition, there are witnesses—am I now allowed to say that now?

\* \* \* \*

[THE STATE]: All right. You indicated that part of your function is to look at or eliminate those diseases [Ms. Ebberts's heart and lung disease] as a cause of death. What do you base that upon or what is your conclusion and what do you base that upon?

[DR. RIPPLE]: I base that on the severity of the findings of her disease process as well as other intervening circumstances through investigation and other physical findings of injury at all.

[THE STATE]: ... So you have indicated then that that finding has to go in conjunction with the other findings, is that what you are saying?

[DR. RIPPLE]: Absolutely. You have to take it all together.

[THE STATE]: All right. So let's base it upon, if you can, what information you have related so far, first off, the information you said that was provided by the police and

then also your investigator's information and, I apologize, if you can pick it up back where you were.

[DR. RIPPLE]: I was at the investigation point but I believe I had stated the findings of our investigator, of the ransacking and the robbery, the police reports indicating ransacking and robbery and some witness statements in the police reports; also the physical findings at autopsy. There was a hemorrhage in her mouth where it shouldn't be, indicating pressure on the mouth, hemorrhage, bleeding. That is indicative of smothering, pressure to the mouth in some manner from an external force, be it a hand, be it a pillow, something pushing on her mouth. And, in addition, so that would be the smothering part.

In addition, there are other injuries on her that you can't ignore also. They might not be part of the exact smothering but it is part of the injury that you have to take into consideration. Of course smothering is holding something over the mouth. Just because I have bruises in my arms doesn't mean that I'm smothered. But she does have bruises on her arms as I stated. So she has additional injuries.

Rollins's primary objection to Dr. Ripple's testimony stems from her reliance on statements from certain witnesses contained in the medical examiner's file as part of the basis for her opinion that Ms. Ebberts was smothered. Rollins contends that this reliance on statements which constitute hearsay provided Dr. Ripple with an insufficient factual basis for her opinion. The Medical Examiner's Investigation Report contained the following, *inter alia*, in the comments section:

"Circumstances: Per Det. Childs. A week or so ago another lady in the decedent's neighborhood wrote a letter saying that a local handyman had said he was going to break in to the decedent's house, smother her and steal her money."

The Baltimore County Police Department's Investigative Correspondence form also included a statement that read: "A nephew related that a former yard worker made statements months ago that he was going to 'smother the victim and steal

her money.' This is why Rollins is listed as a 'possible suspect.'"

In discussing the medical examiner's file, Dr. Ripple testified that it included numerous documents supplied by the Baltimore County Police Department, including the police report and a statement made by Rollins. Also included was the Statement of Charges and a summary of conversations that Det. Childs had with witnesses. When asked about the importance of the statements of witnesses to both her own and Dr. Pestaner's opinion, the following exchange occurred:

[DEFENSE COUNSEL]: And it is true, is it not, that Dr. Pestaner bases his conclusions in this case in part on the statements of these various individuals?

[DR. RIPPLE]: That is one of the pieces of the puzzle. That is one part of the investigation that was used to reach our conclusions.

[DEFENSE COUNSEL]: And, in fact, that is part—that is part of the basis for your conclusion in this case?

[DR. RIPPLE]: That is one of the pieces. There are many other things, many other areas of the investigation that are involved. But that is one of the pieces.

[DEFENSE COUNSEL]: One of the pieces. And, in fact, let me ask you this, could you reach—without this information that was provided by the police that is in your file—let me ask you this. You are basically assuming that the information in these statements is in fact true, is that right?

[DR. RIPPLE]: Yes.

\* \* \* \*

[DEFENSE COUNSEL]: Let me ask you, to what extent are your findings in this case based on that information?

[DR. RIPPLE]: Like I said, it is one piece of the puzzle. Investigation scene showed a house that had been robbed, in extreme disarray. That is a large piece of the puzzle. Our autopsy findings are another large piece of the puzzle; and this is another piece.

[DEFENSE COUNSEL]: Okay, if you do not consider this last piece of the puzzle, can you make any conclusions regarding cause and manner of death in this case?

[DR. RIPPLE]: Yes.

[DEFENSE COUNSEL]: Based on what?

[DR. RIPPLE]: Based on the fact that we have an elderly individual who is debilitated in a house through investigation that shows that foul play has occurred, meaning robbery, ransacking, et cetera. And then we also have the hemorrhages in the arms and the hemorrhage in the mouth. So to a reasonable degree of medical certainty this woman was asphyxiated during a robbery and the physical findings indicate smothering.

[DEFENSE COUNSEL]: But based on the physical findings themselves, would you reach that same conclusion?

[DR. RIPPLE]: We never make cause and manner of death determinations on physical findings alone. It is part of our job to consider everything.

[DEFENSE COUNSEL]: I understand that. But my question is could you make that determination based on the physical findings alone?

[DR. RIPPLE]: No. Because I just stated we have to have investigation involved also.

Dr. Ripple testified that, when investigating a death, the medical examiner's office relies on law enforcement to provide it with information surrounding the history of the death, which requires obtaining "an account of the events leading up to or surrounding the death of the individual from law enforcement, relatives, witnesses [and] other physicians that took care of the patient." During trial, Dr. Ripple was asked what could be included in the medical examiner's file and she included autopsy reports and photographs with toxicology, rough body diagrams, all written findings associated with the case, ancillary studies, a flow sheet that shows communication with certain individuals with regard to the case, medical records, police reports of various types, photos, and sometimes witness statements. Dr. Ripple explained her findings and stated that

she based her conclusions on "the investigative findings of our investigator and the police, the physical findings of the autopsy, including microscopic sections and a review of her health records." The investigative findings of the police did include some witness statements in the police report.

We begin our analysis by revisiting one of the issues we decided in *Ellsworth, supra.* Ms. Ellsworth offered testimony from Dr. Stephan Spivak, a professor at the University of Maryland, concerning the contents of the reports at issue to illustrate the basis of her expert's opinion testimony. *Id.* at 602, 495 A.2d at 359. Dr. Spivak testified that Ms. Ellsworth's nightgown was defective and unreasonably dangerous due to its flammability and that the Federal standard was insufficient in its protection. *Id.* To support his opinion, Dr. Spivak sought to review data taken from the reports, averring that the data in the reports was recognized as reliable and regularly used by members in his field. *Id.* at 602–603, 495 A.2d at 359. The trial judge ruled that any testimony regarding the data contained in the reports was inadmissible as hearsay. *Id.* at 603, 495 A.2d at 359.

We held that, while the proffered evidence did meet the definition of hearsay, it could be admitted "for the limited purpose of explaining the basis for the expert's opinion." *Id.* In support of our holding we noted our decision in *Attorney Grievance Comm'n v. Nothstein,* 300 Md. 667, 679, 480 A.2d 807 (1984) (quoting D. BINDER, HEARSAY HANDBOOK § 1.01, at 451 (2d ed. 1983)):

> The federal courts and a majority of state courts permit an expert witness to express an opinion that is based, in part, on hearsay of a kind that is customarily relied on by experts in that particular business, profession, or occupation. However, the hearsay itself is not admissible as substantive evidence. It is only admissible to explain the basis of the expert's opinion. In other words, the trier of fact is allowed to give credence to an expert's opinion that is based on the assumption that certain hearsay is true, but is not allowed to give credence to the hearsay itself.

This rule has long been accepted in Maryland. *Consol. Mech. Contractors v. Ball,* 263 Md. 328, 283 A.2d 154 (1971); *Air Lift, Ltd. v. Bd. of Co. Comm'rs,* 262 Md. 368, 278 A.2d 244 (1971); *Baltimore & O.R.R. v. Hammond,* 128 Md. 237, 97 A. 532 (1916); *Baltimore City v. Hurlock,* 113 Md. 674, 78 A. 558 (1910).

*Id.* We concluded that Ms. Ellsworth was entitled to elicit from her expert the reasons for his opinion and, because a proper foundation for the introduction of statistical information contained in the reports was presented, the evidence should have been admitted. *Id.*

In the instant case, we disagree with Rollins's contention that Dr. Ripple relied upon improper information to render her expert opinion. Dr. Ripple's consideration of the medical examiner's file in its entirety was proper. She testified that a review of all aspects of the file, including the criminal investigation, was necessary to form her opinion and was the accepted practice in her field. This was not disputed by the defense. As we have reiterated, Maryland law permits experts to express an opinion based partly upon hearsay evidence if the hearsay is of a type typically relied upon in their field. *See Kent Vill. Assoc. Joint Venture v. Smith,* 104 Md.App. 507, 524, 657 A.2d 330, 338 (1995) (holding that an expert in rehabilitation counseling could rely upon medical personnel, social workers and psychologists "in order to get the full picture" to determine the future health care expenses of an injured child, because such reliance was customary in her field). Dr. Ripple testified that it was the common practice in her field, and one of her duties, to review the medical examiner's file in its entirety, including communications with the police and statements of witnesses. These aspects of the case were all considered by Dr. Ripple to be "pieces of the puzzle" that she was required to assess before coming to a conclusion. This assessment includes review of all facts surrounding the victim's death. Section 5–311(a)(2)(iv) of the Health General Article provides that each of the deputy medical examiners *shall* keep complete records on each medical examiner's case and that these records *shall* include, among other things, "*all*

*other available information about the death."* Section 5–309(c) of the Health General Article also provides that, upon a determination by the sheriff or police that a death under one of the enumerated circumstances in § 5–309(a)(1) has occurred, "[t]he medical examiner or the investigator shall investigate fully the essential facts concerning the medical cause of death." Even if the witness statements were hearsay, the statements were the type of hearsay regularly relied upon by medical examiners in the formation of their conclusions.

Rollins argues that Dr. Ripple was allowed to render an expert opinion as to petitioner's guilt and that Dr. Ripple determined credibility and resolved conflicting facts based on documents and witness statements given to the police. We note that this Court rejected an argument similar to petitioner's in *Sippio v. State,* 350 Md. 633, 714 A.2d 864 (1998), where Sippio contested the admission of the testimony of the medical examiner, Dr. Smialek, that the victim's cause of death was a gunshot wound to the head, and the manner of death was homicide. In determining the propriety of the admission of Dr. Smialek's testimony, we noted that Dr. Smialek had been qualified as en expert in the field in which he was testifying, the subject matter about which Dr. Smialek testified was appropriate since he had performed the autopsy [29] and conducted the investigation, and that his testimony aided the trier of fact. *Sippio,* 350 Md. at 649–51, 714 A.2d at 872–74. In rejecting Sippio's argument that Dr. Smialek's testimony was inadmissible because it resolved a conflict in evidence and because it related to the credibility of a witness, we noted:

> Dr. Smialek's testimony as to manner of death did not resolve a conflict in evidence. Expert opinion testimony, like any opinion testimony, is designed to introduce, bolster,

**29.** The fact that Dr. Smialek had performed the autopsy on the victim in *Sippio* was not the sole reason for our decision that the subject matter that Dr. Smialek testified about was appropriate. We noted Dr. Smialek's testimony concerning his knowledge of Sippio's statement to police that he had shot the victim, taken together with the investigation, allowed him to reach the conclusion that the victim's death was a homicide. *Sippio,* 350 Md. at 650–51, 714 A.2d at 873.

or place doubt on evidence properly admitted before the trial court. The fact that Petitioner and Respondent have different theories of [the victim's] death in no way precludes either party from introducing evidence that tends to support or place doubt on previously admitted evidence. Similarly, Dr. Smialek's testimony did not resolve a question of Sippio's credibility merely because Sippio denied the shooting was deliberate. Had Dr. Smialek testified that Sippio's credibility was questionable based on statements Sippio made before or during trial, an exclusion of such testimony might have been proper. Dr. Smialek, however, did not opine on Sippio's credibility.

*Id.* at 652–53, 714 A.2d at 874. In the instant case, Dr. Ripple did not opine on Rollins's guilt, she opined, in her expert opinion, that Ms. Ebberts died of smothering and that the time of death of the victim coincided with the time of the robbery.[30]

■ We also point out that the hearsay at issue in the medical examiner's file was otherwise admissible as the declarant, Debra Dehne, testified at trial regarding her statements and was subject to cross-examination. A search of the record suggests that the statements contained in the police and medical examiner's investigation reports constitute the hearsay with which the defense is concerned. Ms. Dehne was a former neighbor of Ms. Ebberts and testified at Rollins's trial. Ms. Dehne testified that, in the Spring of 2001, Rollins told her that he "could kill" Ms. Ebberts and then went on to

---

**30.** We decline to follow those cases cited by petitioner in support of his argument that Dr. Ripple impermissibly resolved questions of fact through her testimony. Two cases that petitioner cites, *State v. Vining,* 645 A.2d 20 (Me.1994) and *Maxwell v. State,* 262 Ga. 73, 414 S.E.2d 470 (1992), are distinguishable from the present case. In both *Vining* and *Maxwell,* the medical examiners based their opinions on the respective causes of death of the victims *solely* on information given to them by police detectives. *See Maxwell,* 414 S.E.2d at 473–74 (citations omitted), *State v. Vining,* 645 A.2d at 20–21 (footnote and citations omitted). In the instant case, Dr. Ripple clearly testified that she based her opinion on the information gathered from police in the process of the medical examiner's investigation *in conjunction with* the findings at the scene, the autopsy report and Ms. Ebberts's medical records.

explain how he would do so by "tak[ing] a pillow [and] put[ting] it over [Ms. Ebberts's] head." Ms. Dehne wrote down the details of this statement and gave the information to the police when they were called to Ms. Ebberts's home. Rollins had been staying in Ms. Dehne's home in the Spring of 2001. According to Ms. Dehne's testimony, Rollins originally came to her home because he was acquainted with her nephew, Tony Spence.[31] Ms. Dehne testified regarding the letter during trial, was cross-examined on its contents, and authenticated the document. Clearly, Rollins was able to confront Ms. Dehne regarding her statements.

█ It has been a long-standing principle in Maryland law that "the opinion of an expert witness, the grounds upon which it has been formed, and the weight to be accorded to it are all matters for the consideration of the jury." *Marshall v. Sellers,* 188 Md. 508, 518, 53 A.2d 5, 10 (1947) (citing *Davis v. State,* 38 Md. 15, 41 (1873)). The medical expert witnesses provided by the defense in the present case reviewed the same materials as Dr. Ripple and used those materials upon which to base their opinion, and all experts were cross-examined. *See Maryland v. Craig,* 497 U.S. 836, 846, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990) (citing *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970) ("Cross-examination is the 'greatest legal engine ever invented for the discovery of truth.'")). All experts, including Dr. Ripple, were subject to cross-examination about their findings; once the experts' opinions were admitted, it was within the province of the trier of fact to determine which expert should be believed.

█ We reject petitioner's theory that the admission of an autopsy report, without the testimony of its preparer, is a *per se* violation of the Confrontation Clause. *Bowers* makes it

---

31. With regard to the statement contained in the Baltimore County Police Department's Investigative Correspondence form regarding a "nephew," it is not clear to whom this statement is referring. It could be concluded that the "nephew" referred to in the statement is Ms. Dehne's nephew, Tony Spence.

clear that an autopsy report may be admitted without the testimony of the physician who prepared it. An autopsy report, however, should be supplemented at trial with expert testimony in regard to the "manner" of death. *See* Joseph F. Murphy, Jr., Maryland Evidence Handbook § 804(D)(1) at 328 (3d ed. 1999) (citing *Benjamin v. Woodring*, 268 Md. 593, 608–609, 303 A.2d 779, 788 (1973)). Our decisions in *Benjamin v. Woodring* and in *Sippio, supra*, support the proposition that, while the determination of manner of death is clearly within the purview of the medical examiner, the manner of death portion of an autopsy report should be supplemented with expert testimony at trial. In the instant case, consistent with the requirements of Maryland law, Dr. Ripple's testimony supplemented the autopsy report both as to manner and cause of death.

The autopsy report in the instant case, as redacted, contained non-testimonial hearsay statements in nature that were admissible under either the business or public records exceptions to the hearsay rule. Although the autopsy report fell within both the business and a public record exceptions, the trial court was correct to review the contents of the autopsy report to determine the propriety of its admission into evidence without the testimony of its preparer. As redacted, the autopsy report contained merely findings about Ms. Ebberts's physical condition that could be characterized as routine, descriptive, and non-analytical. Accordingly, we find no error in the admission of the report into evidence without the testimony of Dr. Pestaner and find no violation of petitioner's rights pursuant to the Confrontation Clause.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.**